IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| KODY AUSTIN KETRING, | : | Case No. 1:21-cv-582 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| CITY OF LOVELAND, et al., | : | |
| Defendants. | : | |

## ORDER AND OPINION

Following a police investigation which resulted in a bite from a police dog, Plaintiff Kody Ketring brought this lawsuit against the City of Loveland and several police officers. The defendants removed the matter to federal court. (Doc. 1.) Following discovery, Defendants moved for summary judgment. That motion is now ripe for the Court's review. (Doc. 18.) For the reasons explained here, the Court **GRANTS** the motion for summary judgment.

## FACTS

Kyle Bibelhausen, an officer with the City of Loveland Police Department, was in uniform in the early morning hours of September 1, 2019. (Expert Report, Doc. 18-2, Pg. ID 654-55.) He and his canine partner, Mack, were dispatched to Mohican Drive in Loveland on a report that someone had been shot. (*Id.* at Pg. ID 654.) He was the first officer to arrive on scene. When he arrived, Brandon Carey was lying in a driveway. (Bibelhausen Dep., Doc. 12, Pg. ID 103-04.) He had gunshots to his legs and there was a

puddle of alcohol-smelling vomit next to his head. (Offense Report, Doc. 17-1, Pg. ID 554.) Several other people were also there. One of them told Officer Bibelhausen that someone had shot Brandon, and that the shooter was either Kody Ketring or Tyler Ketring. (Bibelhausen Dep., Doc. 12, Pg. ID 103, 107; Expert Report, Doc. 18-2, Pg. ID 654.)

Lieutenant Kevin Corbett arrived on scene. He would later report that the sister of the gunshot victim, Brianna Carey, told him it was Tyler Ketring who shot her brother. (Offense Report, Doc. 17-1, Pg. ID 554.) He instructed Officer Bibelhausen to begin tracking the suspect with his police dog. Officer Bibelhausen took Mack out of the cruiser. Mack picked up a scent and began to track. (Bibelhausen Dep., Doc. 12, Pg. ID 111, 113.) It was understood that Officer Bibelhausen had authority to use the dog to "end the threat" if a "suspect refused to follow commands." (Corbett Dep., Doc. 16, Pg. ID 437.)

The canine track led to an address on Sunrise Drive. Officers formed a perimeter around the house and tried to make contact with the occupants. A female initially refused to exit but, after about twenty minutes, left the residence with a child. A male—matching the description of the shooting suspect—appeared at the front door. (Expert Report, Doc. 18-2, Pg. ID 654.) It was Kody Ketring, but the officers didn't know that yet. (Ketring Dep., Doc. 15, Pg. ID 326-27, 339.)

From the doorway, Kody told the police officers to come back with a warrant. He was using profanity and screaming through the door. He told the officers he was not coming out. He did not tell the officers that he was Kody Ketring. But eventually he stepped outside on the front porch with his hands up. (*Id.* at 327-44) In his telling, he

2

"spun around to show that [he] was unarmed," then turned to go back in. (*Id.* at Pg. ID 346.) At around that point, Officer Bibelhausen released Mack. (*Id.*) Video footage shows Ketring quickly reaching back to open the screen door—he was still within an arm's reach. Mack came racing up the steps toward Ketring. (Ex. C, K9 Apprehension, Doc. 22, 0:45-1:05.) By then, because he was just outside the front door, Ketring had made it into the threshold. He shut the screen door on Mack's head and he got back inside the house. (*Id.*; Ketring Dep., Doc. 15, Pg. ID 347-49.) He slammed the main door shut. The police ran up to the front door and opened it. That's when Mack ran in and bit Ketring on the shoulder. Officer Bibelhausen pulled the dog off Ketring and handcuffed him. (Ketring Dep., Doc. 15, Pg. ID 347-52.)

Ketring was placed in an ambulance. In the ambulance, Lieutenant Corbett told him that they had been looking for his brother Tyler because he had shot somebody. Then Ketring was taken to a hospital for medical care. (*Id.* at Pg. ID 352-57.) There he found out that he had been charged with obstructing official business. After that, the police took him to the Hamilton County Justice Center. He posted bond and went home. (*Id.* at Pg. ID 366-67.) The charge against him was eventually dismissed. (Doc. 18-1, Pg. ID 632, ¶ 41.)

## LAW AND ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court must grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

3

(1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Ketring brings sixteen claims, most of them under 42 U.S.C. § 1983, against the City of Loveland and various officers. He accuses Defendants of violating § 1983 for unnecessary use of force, failure to protect, failure to provide proper training and supervision, failure to provide proper warning, failure to intervene, violating policy/practice/custom, assault and battery, willful and wanton conduct, and failure to investigate/respondeat superior. He also advances claims for negligence, personal injury, assault and battery, malicious prosecution/abuse of process, liability under R.C. 2744 et seq., R.C. 2307.60, R.C. 2903.13 (assault and battery), and R.C. 2921.45 (interfering with civil rights), and strict liability under R.C. 955.58 regarding the dog bite.

Defendants' chief argument is that the individual defendants are entitled to

4

qualified immunity. That defense is dispositive of the entire case, so the Court will begin there.

> I. **The individual officers are entitled to qualified immunity as to all federal claims.**

Ketring concedes that he has no claim against Division Chief Dennis Rahe or Anthony Pecord. So the Court will first address Ketring's federal claims against Officer Bibelhausen and Lt. Corbett.

Defendants maintain that Officer Bibelhausen and Lt. Corbett are entitled to qualified immunity. Courts look at qualified immunity in two steps: (1) whether a constitutional right has been violated, considering the allegations in a light most favorable to the injured party, and, if so (2) whether that right was clearly established at the time of the offense. *Jackson v. Hamilton Cnty., Ohio*, No. 1:08CV203, 2008 WL 11452582, at *1 (S.D. Ohio Nov. 25, 2008). If both of those conditions are met, the doctrine of qualified immunity shields police officers from civil liability. *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021). Once a defendant raises the qualified immunity defense, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. This question hinges on the circumstances of the case in light of prior precedent. *Jordan v. Howard*, 440 F. Supp. 3d 843, 854 (S.D. Ohio 2020). As a matter of sequence, a court need not address the two prongs in a specific order—if the "clear established" prong is dispositive then the court may begin and end there. *Tlapanco v. Elges*, 969 F.3d 638, 657 (6th Cir. 2020).

A "clearly established right" is a right so sufficiently clear that every reasonable

5

official would have known that he was violating that right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The Supreme Court has advised lower courts "not to define clearly established law at too high a level of generality." *Tahlequah*, 142 S. Ct. at 11. The plaintiff need not point to a case directly on point, but existing precedent must place the status of the right beyond question. *Id.* The question a court asks is whether a reasonable officer could have believed that his or her actions were lawful. *Jordan*, 440 F. Supp. 3d at 856. In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Ketring contends that Officer Bibelhausen and Lt. Corbett's conduct violated his clearly established rights. He argues that Defendants violated his clearly established constitutional right of reposing peacefully in his home without being attacked by a police dog, when he had not been placed under arrest and no search or arrest warrant had been issued. In his view, Officer Bibelhausen's deployment of Mack was an excessive and objectively unreasonable use of force. He accuses Lt. Corbett of failing to impart information about the identity of the suspect to Officer Bibelhausen.

When an excessive force claim arises from "an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). So the Court will analyze the claims here under the Fourth Amendment's "reasonableness" standard, and not the Eighth Amendment's "substantive due process" standard. *Id.* at 394-95; *Whitley v. Albers*, 475 U.S. 312, 326-27 (1986). That analysis requires careful

6

attention to the facts and circumstances of each case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 787 (6th Cir. 2012).

The Sixth Circuit has found, several times, that it may be reasonable to deploy a police dog to apprehend potentially dangerous suspects who are fleeing police or otherwise not cooperating. In *Robinette v. Barnes*, the court applied qualified immunity when an officer used a police dog to apprehend a criminal suspect who was hiding in an enclosed, unfamiliar area. 854 F.2d 909, 914 (6th Cir. 1988). The dog caused the death of the suspect, an "extreme aberration," but because police dogs can help officers from resorting to (or being subject to) deadly force, the court could not say that the officers acted unreasonably. *Id.* at 912-14.

Similarly, in *Matthews v. Jones*, the court found that an officer was entitled to qualified immunity after he deployed a police dog to apprehend a man suspected of reckless driving who had fled into the woods. 35 F.3d 1046, 1051 (6th Cir. 1994). The officers had called out orders for the man to surrender, warning him that they would release the dog if he did not respond. When he didn't, the officer released the dog and the dog found and bit down on the man. *Id.* at 1048. The court reasoned that a reasonable officer would have believed that the suspect posed a threat to the officers' safety, as well as others. *Id.* at 1051.

The Sixth Circuit later synthesized these two cases, explaining that in both scenarios, qualified immunity applied because the crimes the suspects had committed

7

suggested they were potentially dangerous, and because they were behaving irrationally. Also relevant were the facts that the police dogs were properly trained and the officers gave the suspects several warnings before unleashing their dogs. *Campbell*, 700 F.3d at 789.

Another case, *Dunigan v. Noble*, resulted in qualified immunity after a police dog bit a fugitive. 390 F.3d 486, 492 (6th Cir. 2004). A parolee was on the run and police received a lead on his whereabouts. Officers and a police dog arrived at the residence. After the parolee did not respond to orders to surrender, a scuffle ensued and the dog bit the parolee's leg. The court found that the circumstances justified the dog's presence. The canine officer legitimately believed the parolee might flee and the dog, which was trained to track, "served the legitimate purpose of curtailing that possibility." *Id.*

Lastly, *Ashford v. Raby* teaches that the use of police dogs can be reasonable in situations when a suspect is behaving erratically even when the suspect was harboring no ill will or subjective intention to harm the officers. 951 F.3d 798, 802 (6th Cir. 2020). In that case, officers had pulled over a man who was speeding and driving erratically. When he finally stopped the car, he thrust his hands out the window, but did not get out of the car. The reason why was because the car was still in drive and he was worried that, if he got out of the car, his car would collide with a police cruiser. *Id.* at 800. In the din of the shouting and barking, *Ashford v. Raby*, No. 18-10813, 2019 WL 2231188, at *1 (E.D. Mich. May 23, 2019), no one could understand that the driver was trying to tell the officers that perhaps they could reach in and put the car in park. The police sent the dog and the driver was bitten and dragged out of the car. *Ashford*, 951 F.3d at 800-01. The Sixth Circuit

8

found that any other alternative would have placed the officers at greater risk. It was reasonable to deploy the dog in such a tense situation and, at the very least, there was no obvious incompetence or violation of clearly established law. *Id.* at 803.

To be sure, some uses of police dogs have been unreasonable. *Campbell* involved a poorly trained police dog who attacked two suspects who were not actively fleeing. 700 F.3d at 789. Qualified immunity did not apply there. The court relied on *White v. Harmon*, another case that involved an officer who let a little-trained canine with a history of biting to bite a handcuffed suspect. 65 F.3d 169 (6th Cir. 1995).

The record and precedent support the application of qualified immunity for Officer Bibelhausen and Lt. Corbett. Look at these facts from Officer Bibelhausen's perspective. *Ashford*, 951 F.3d at 802 ("we must consider what was reasonable from the *officer's* perspective, not the suspect's") (emphasis original). He arrives at the crime scene to find a man bleeding on a driveway. He is told the man was shot. Then he is told to begin tracking the suspect with his police dog. His dog leads him to a nearby residence. A man inside matches the description of the shooting suspect. Yet the man refuses to come out and demands that the officers come back with a warrant. His belligerence prevents the officers from being able to determine whether he is the one who shot the man bleeding in the driveway. And, by extension, they cannot be sure he is not armed. Eventually he comes out—but barely. The man is still within an arm's reach of the front door. Part of Officer Bibelhausen's authority as a canine officer is to end threats when suspects refuse to follow law enforcement commands. (*See* Corbett Dep., Doc. 16, Pg. ID 437.) So, to end the threat, Officer Bibelhausen deploys Mack. Ketring flees, slams Mack's

9

head in the door, the officers open the door, and Mack bites Ketring.

The facts here compare more favorably with those in *Robinette*, *Matthews*, *Dunigan*, and *Ashford*. Ketring, though he was not the actual suspect, was in the residence that Mack led the officers to. But this was not simply a case of being in the wrong place at the wrong time. The facts and circumstances show that the police responded reasonably. First, what was the severity of the crime? It was grave. The officers were investigating a shooting—they had just found a man with multiple gunshots lying in a driveway. (Offense Report, Doc. 17-1, Pg. ID 554.) Second, did the suspect poses an immediate threat to the safety of the officers or others? From the officers' perspective, yes. And that's the perspective we consider. *Ashford*, 951 F.3d at 802. When Officer Bibelhausen got eyes on Ketring, he was able to confirm that he matched the shooting suspect's description. (Report, Doc. 12-1, Pg. ID 164.) So they were encountering a belligerent man, matching the suspect's description, who refused to come out. And Ketring made a tense situation worse by screaming and cursing at the police officers. His behavior impeded the officers' ability to confirm his identity to verify whether he was the shooter. So they could not be sure he was not the shooter, or that he was not armed. He thus posed a threat to the officers' safety and to others. Third, was he actively resisting arrest or attempting to evade arrest by flight? The officers had formed a perimeter around his house, so there was nowhere he could go. But Ketring was actively resisting, if not arrest, any ability for the police to investigate a serious crime for which the suspect was still at large. Even when he came out, he remained an arm's length from the front door. Indeed, the bite did not occur until *after* Ketring had turned to flee and made it back inside. That

10

makes this case markedly different from *Campbell*, Ketring's best case. It was not until Ketring was back inside his residence, having fled from apprehension, that Mack bit him and brought an end to the confrontation. Though Officer Bibelhausen did not give verbal canine warnings, that was because things were moving fast. The situation was changing rapidly. (Report, Doc. 12-1, Pg. ID 164.) And, bear in mind, this was after Ketring had already received numerous commands to come outside and get down on the ground. (*Id.*) In light of the relevant considerations, then, Officer Bibelhausen responded the way any reasonable police officer would. There is nothing plainly incompetent about his conduct that morning. *See Ashford*, 951 F.3d at 803.

For related reasons, Lt. Corbett is entitled to qualified immunity as well. Ketring claims that Lt. Corbett failed to tell Officer Bibelhausen that the shooter was Tyler, not Kody. In Lt. Corbett's dashcam footage, someone can be heard asking, "Where's Tyler Ketring live?" (*See* Ex. B, Notice, at 1:15-1:21.) That question suggests that Tyler was a suspect. And he reported later that someone had told him that Tyler Ketring had shot the victim. (Offense Report, Doc. 17-1, Pg. ID 554.) Ketring argues that Officer Bibelhausen "asserted that he was unaware of the information possessed by Lt. Corbett." (Response, Doc. 23, Pg. ID 766.) But he does not make any cite to the record supporting that claim. In fact, Officer Bibelhausen's deposition testimony seems to contradict Ketring's characterization of the facts—he testified that he heard Lt. Corbett talk with the lady who told him about Tyler Ketring and was present while they spoke about Tyler. (Bibelhausen Dep., Doc. 12, Pg. ID 108.) But even viewing the facts in a light most favorable to Ketring, nothing shows that Lt. Corbett engaged in any unconstitutional

11

behavior. Lt. Corbett instructed Officer Bibelhausen to begin a track of the suspect. The canine search led to the Ketrings' house. At that point, critically, the object was to determine if the shooter was at the house. But Kody Ketring's belligerence made that impossible. In any case, Ketring has pointed to nothing that suggests Lt. Corbett is plainly incompetent for telling Officer Bibelhausen to initiate a canine track for a shooting suspect without telling him the suspect's name. *See Stanton v. Sims*, 571 U.S. 3, 6 (2013). The purpose of the canine track itself is to find *suspects*. That the search led the officers to the Ketring residence was an indicator that a potential suspect was there—not a conclusive one but still one that justified investigation. During that legitimate investigation, Ketring escalated matters by fleeing from the police. It was not until after he began to flee that Mack bit him. And case law makes clear that there is nothing unreasonable or unconstitutional about using a police dog to apprehend a potential suspect who is fleeing the police or otherwise not responding to their efforts to complete a lawful investigation. *Compare Campbell*, 700 F.3d at 789 (no qualified immunity for officers after dog bites of suspects who were not actively resisting) *with Ashford*, 951 F.3d at 803 (qualified immunity for officers after a dog bite of a man who was not responding to police commands and any alternatives would have meant greater risk of harm to officers).

One more observation warrants mention. The Supreme Court has warned courts not to define clearly established rights at too high a level of generality. *Tahlequah*, 142 S. Ct. at 11. Ketring's highly generalized "right to repose peacefully in his home" falls short of that standard. Such a "lofty definition of the right" fails to do what qualified immunity

case law requires, which is to articulate a "concrete, particularized description of the right." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012). Besides failing to cite a case that supports that supposed right, he improperly frames it in overly broad terms.

In light of all the above, Officer Bibelhausen and Lt. Corbett are entitled to qualified immunity on all of the § 1983 claims (counts 1-5, 7, 9-12, 14).[1]

## II. The City of Loveland is entitled to summary judgment.

Ketring makes a number of federal claims against the City of Loveland that all cohere around the theory that the City failed to properly train or supervise its officers (counts 7, 9, 12, 14). But because neither Officer Bibelhausen nor Lt. Corbett violated a clearly established right, their employer, the City of Loveland, is also entitled to summary judgment. To hold the City liable, Ketring must how that its failure to train officers on the proper deployment of police canines amounts to deliberate indifference. *Hagans*, 695 F.3d at 511 (*citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A municipal policymaker, however, does not exhibit deliberate indifference to a constitutional right when that right is not clearly established. *Tlapanco*, 969 F.3d at 657 ("This court has consistently held that a municipality cannot be held liable on a failure to train theory where a right was not clearly established."); *Hagans*, 695 F.3d at 511; *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).

Accordingly, the City is entitled to summary judgment on Ketring's federal claims.

---

[1] A note on count 14: Ketring cites Ohio statutes in the title of the cause of action, but brings the claim itself under 42 U.S.C. § 1983. (Complaint, Doc. 4, ¶ 127.) For that reason, the Court treats that claim as being brought under § 1983.

13

### III. The Court declines to exercise supplemental jurisdiction over the state law claims.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal law vests district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If a court has original jurisdiction, it also has supplemental jurisdiction over other claims that are so related to the other claims that they stem from the same controversy. 28 U.S.C. § 1367(a). But as a matter of statute, it may decline supplemental jurisdiction when it has dismissed all the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). *See also Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). And, as a matter of comity and justice, when adjudication of a summary judgment motion leaves a plaintiff with no federal cause of action, courts should not exercise supplemental jurisdiction over the state claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

Here, no federal claims remain. And no overriding interests of judicial economy, comity, or convenience warrant this court's exercise of supplemental jurisdiction over the state claims. The claims for personal injury, assault and battery, malicious prosecution/abuse of process, strict liability, and negligence (claims 6, 8, 13, 15, 16) are creatures of Ohio state law. The Ohio courts are as capable as this court to resolve those claims. *See Wynn v. Morgan*, 861 F. Supp. 622, 637 (E.D. Tenn. 1994). When federal claims

are dismissed, state claims should generally be dismissed as well. *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009); *McGuire v. City of Moraine, Ohio*, 178 F. Supp. 2d 882, 903 (S.D. Ohio 2001). Accordingly, the Court declines to exercise its supplemental jurisdiction over the state law claims.

## CONCLUSION

For the reasons above, the Court orders as follows:

(1) Defendants' motion for summary judgment is **GRANTED**;

(2) Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**;

(3) The Court declines to exercise supplemental jurisdiction, and consequently the state-law claims are **DISMISSED WITHOUT PREJUDICE**;

(4) This matter is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: *[signature: Matthew W. McFarland]*

JUDGE MATTHEW W. McFARLAND